Filed 10/6/15  Sotelo v. Fernandez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| EDUARDO SOTELO,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TOMAS A. FERNANDEZ et al.,<br><br>    Defendants and Respondents. | B255469<br><br>(Los Angeles County<br>Super. Ct. No. SC121247) |

APPEAL from an order of the Superior Court of Los Angeles County, Richard A. Stone, Judge.  Affirmed.

Lerman Pointer & Spitz, Jeffrey Spitz; Greines, Martin, Stein & Richland, Robin Meadows and Cynthia E. Tobisman for Plaintiff and Appellant.

Taylor & Ring, John C. Taylor and Robert R. Clayton for Defendant and Respondent, Tomas A. Fernandez.

Winget Spadafora & Schwartzberg, Brandon S. Reif, Rebecca E. MacLaren and Marc S. Ehrlich for Respondents, Robert Clayton, John C. Taylor and Taylor & Ring.

_____

Plaintiff Eduardo Sotelo appeals from an order granting the defendants' special motion to strike the complaint under Code of Civil Procedure section 425.16, the anti-SLAPP statute.[1] The trial court granted the motion under the second step of the two-part analysis on the ground the litigation privilege codified under Civil Code section 47, subdivision (b) barred plaintiff's suit. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff is a radio celebrity, known to his listeners as "Piolin." For many years, plaintiff hosted a nationally syndicated morning program called *Piolin por la Mañana*, produced by Univision Radio in Los Angeles. In March 2013, Alberto "Beto" Cortez contacted one of the defendants, Robert R. Clayton, an attorney with the firm, Taylor & Ring. Cortez worked on *Piolin por la Mañana* as its producer for 10 years. He claimed plaintiff committed acts of physical, sexual and emotional abuse during the time they worked together. Cortez retained Clayton to represent his claims. On April 16, 2013, Clayton sent a letter to Univision Radio summarizing Cortez's claims and began discussions with Univision's general counsel concerning those claims.

On July 22, 2013, Univision Radio cancelled *Piolin por la Mañana*. Somehow, the Los Angeles Times obtained Clayton's letter and wrote an article about Cortez's allegations. The article ran on July 23, 2013. Within the article, plaintiff's counsel, Jeffrey Spitz, was quoted as claiming Cortez was a "disgruntled, troubled employee."

In early August 2013, apparently prompted by the Los Angeles Times' article, six former staff employees[2] from *Piolin por la Mañana* came to Clayton's law firm seeking advice on their own claims of abuse against plaintiff. Each complained about plaintiff's alleged inappropriate behavior, including unwanted touching, name calling, and

---

[1] SLAPP is the acronym for strategic lawsuit against public participation. All further undesignated statutory references are to the Code of Civil Procedure.

[2] The six former staff employees are Tomas Alejandro Fernandez, Samuel Heredia, Gerardo Palencia, Domingo Rodrigo Ochoa, Sergio Vera and Bertha "Betty" Velasco.

2

unseemly physical conduct in front of others. After consultation, Clayton drafted a letter[3] addressed to Spitz setting forth the claims of abuse made by the six former staff employees. According to Clayton, time was of the essence because of an impending statute of limitation deadline for some of the claims made by several of the staff employees.

On August 16, 2013, Clayton faxed the letter to Spitz. Three days later, Clayton spoke with Spitz and his law partner, Glenn Lerman, by phone. Spitz acknowledged receipt of the letter and confirmed he represented plaintiff. They spoke regarding the six staff employees' claims.

On August 21, 2013, Clayton sent a written demand, at Spitz's request, to settle the six staff employees' claims. The demand letter was brief. It stated, "In response to your request for a settlement demand, we have been authorized to resolve all of our

---

[3]    We quote the letter sent from Clayton to Spitz, excluding salutations and portions related to the six staff employees' allegations:

"We have been informed that you represent Eddie "Piolin" Sotelo. As a result, I am directing this correspondence to you rather than Mr. Sotelo. If you do not represent Mr. Sotelo, please let me know that immediately so that I can send this letter directly to him.

"We represent six (6) individuals that worked for Univision and were assigned to the Piolin por la Mañana Show: Gerardo Palencia, Tomas Fernandez, Samuel Heredia, Sergio Vera, Bertha Velasco, and Rodrigo Ochoa. Your client was the host of the show.

"Each of our clients was subjected to abusive and damaging conduct at the hands of Mr. Sotelo. Here is a brief summary of our clients' allegations: [¶] . . . [¶]

"After someone leaked my letter in the Cortez case to the media and Piolin publicly denied the allegations and attack[ed] Mr. Cortez, this group of former co-workers could take no more. Each knew the allegations raised by Mr. Cortez were true because they witnessed the misconduct and were also subjected to the same injurious abuse themselves. Moreover, each of these individuals was injured and sustained damages themselves.

"Given the highly sensitive nature of these allegations, I have instructed my clients to keep this confidential. It was agreed that I would contact your office to determine if Piolin has an interest in settling their claims.

"You can contact me or my partner, John Taylor to discuss this matter. We both have authority to speak on our clients' behalf."

3

clients' claims against Eddie 'Piolin' Sotelo for four million nine hundred thousand dollars and zero cents ($4.9 million)."

On August 23, 2013, Clayton e-mailed Spitz and advised, "because of statutory deadlines, we will need to file complaints on behalf of our clients next week." Apparently, the statutory deadline for some of the staff employees' claims fell on August 30, 2013.

Spitz changed directions. On August 26, 2013, plaintiff filed a complaint naming nine defendants[4] alleging civil extortion and intentional infliction of emotional distress. The nine named defendants consisted of the six former staff employees claiming abuse, the two lawyers retained by the staff employees, and the two lawyers' law firm. On August 27, 2013, Clayton learned, Spitz had sent a copy of the complaint to the Los Angeles Times, TMZ, as well as other media outlets. Some reported a story concerning the lawsuit.

On October 15, 2013, the staff employees filed a special motion to strike the complaint pursuant to section 425.16, commonly referred to as an anti-SLAPP motion. Concurrently, the attorneys sued by plaintiff filed their own separate anti-SLAPP motion.[5]

On November 18, 2013, plaintiff filed a motion for limited discovery pursuant to section 425.16, subdivision (g). Among other items, plaintiff sought a Severance and General Release Agreement, possibly executed by some of the staff employees when they left Univision Radio. Spitz argued he needed these, if they existed, to carry his burden on the second step. He reasoned the existence of the executed releases would tend to show Clayton did not have grounds for believing a valid suit could be filed. Defendants opposed the discovery motion. On December 18, 2013, the trial court denied plaintiff's

---

[4] The named defendants are Tomas Alejandro Fernandez, Samuel Heredia, Gerardo Palencia, Domingo Rodrigo Ochoa, Sergio Vera, Bertha "Betty" Velasco, Richard R. Clayton, John C. Taylor, and Taylor & Ring, LLP.

[5] Clayton and Taylor were represented by the law firm Winget Spadafora & Schwartzberg, LLP.

4

discovery motion. In the order denying the request, the trial court ruled, "although Plaintiff's request for discovery is understandable, under the circumstances[,] Plaintiff has not shown the good cause required by CCP 425.16(g)."

On March 13, 2014, the trial court granted the defendants' anti-SLAPP motions. The trial court focused on the litigation privilege. On the first step of the anti-SLAPP analysis, the trial court found "[d]efendants have made the required threshold showing that the challenged causes of action arise from protected activity." On the second step, the trial court found plaintiff failed to carry his prima facie burden. In reaching this result, the trial court ultimately concluded, "[a]t best, Plaintiff has adduced evidence that Clayton believed that the claims of three of the seven Staffer Defendants (Ochoa, Vera, and Velasco) were time-barred. . . . However, considering the nature of the claims of the remaining four Staffer Defendants, the fact that two of the Staffer Defendants whose claims were purportedly time-barred (Vera and Velasco) had gone public with their claims before the communications by Clayton which are at issue took place . . . , and the interrelated nature of all seven potential plaintiffs' claims, the Court concludes that even if Clayton believed that the claims of Ochoa, Vera, and Velasco were time-barred, that did not nullify the application of the litigation privilege with respect to the communications at issue." Plaintiff filed a timely notice of appeal.

## Contentions On Appeal

Plaintiff attacks the trial court's ruling on both steps of the anti-SLAPP analysis. In making his arguments, he separates the various staff employees into two categories: (1) time-barred defendants, and (2) release-barred defendants.[6] On the first step, plaintiff argues the time-barred defendants and their lawyers did not make their demands in good faith contemplation of filing a lawsuit. He further contends the time-barred defendants' demands were not constitutionally protected because the demands constituted extortion as

---

[6] Plaintiff claims Ochoa, Vera and Velasco were time-barred by the statute of limitations. By process of elimination, the release-barred defendants would be Fernandez, Heredia and Palencia.

a matter of law.  On the second step, plaintiff argues he presented sufficient evidence to overcome the prima facie burden on his causes of action.  Further, plaintiff claims the litigation privilege does not change the result since he presented evidence negating the application of the litigation privilege or at least raising factual questions regarding its applicability.  Finally, plaintiff contends the trial court prejudicially erred in denying his request for discovery as the written release went to the heart of plaintiff's ability to prove his prima facie case.

## DISCUSSION

The anti-SLAPP statute authorizes a two-step procedure for striking a cause of action at the earlier stages of litigation when it is established that the cause of action was filed to "chill" the defendant's constitutional rights of free speech and or to petition the government.  (§ 425.16, subds. (a) & (b).)  In the first step, the court determines whether the moving defendant has shown that a cause of action arises from "protected activity," i.e., from an act in furtherance of the defendant's constitutional right to petition or free speech as defined in the anti-SLAPP statute.  (§ 425.16, subds. (b)(1) & (e).)  If the defendant carries this burden, the court then undertakes a second step analysis in which it examines the evidence to determine whether the plaintiff has demonstrated a probability of prevailing on his cause of action on the merits.  (§ 425.16. subd. (b)(1); see, e.g., *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West Realty*).)

The standard for reviewing an appeal from an order granting or denying a motion to strike under section 425.16 is de novo.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)  When considering the pleadings and supporting and opposing declarations, we do not make credibility determinations or compare the weight of the evidence.  Instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law.  (*Ibid.*)

6

I.    *Litigation Privilege*

This case turns on the applicability of the litigation privilege and whether Clayton's various communications[7] with Spitz fall within its protective walls.  As a general proposition, prelitigation communication receives protection from the litigation privilege if the statement is made in connection with a proposed litigation that is contemplated in good faith and under serious consideration.  (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 919 (*Blanchard*).)  This is not a test for malice and is not a variation of the "interest of justice" test.  (*Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 266.)  Rather, it is "addressed to the requirement the statements 'have some connection or logical relation to the action.  [Citations.]' " (*Ibid.*)  Thus, if the statement is made with a good faith belief in a legally viable claim and in serious contemplation of litigation, then the statement is sufficiently connected to litigation and will be protected by the litigation privilege.  (*Ibid.*)  If it applies, the privilege is absolute.  (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1202-1203.)

The litigation privilege in California finds its genesis in Civil Code section 47, subdivision (b) which states:  "A privileged publication or broadcast is one made: [¶] . . . [¶] . . . In any . . . judicial proceeding . . . ."  The litigation privilege has been given expansive application by California courts.  It applies to all torts other than malicious prosecutions.  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 211-212 (*Silberg*).)  "[T]he privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.  [Citations.]" (*Id.* at p. 212.)

*Silberg* identified four policy reasons for the litigation privilege:  (1) to afford litigants and witnesses the "utmost freedom of access to the courts without fear of being harassed . . . by derivative tort actions"; (2) to promote the effectiveness of judicial

---

[7]    Clayton's communications with Spitz consisted of sending an initial letter referenced in footnote 3, a subsequent demand letter, several e-mails, and two telephonic conversations about settling the claim.

proceedings by encouraging open channels of communication and the presentation of evidence in judicial proceedings; (3) to promote the effectiveness of judicial proceedings by encouraging attorneys to zealously protect their clients' interests; and (4) to enhance finality of judgments by placing the burden on the litigants during trial to expose witness bias and falsity of evidence, thus avoiding the "unending roundelay of litigation." (*Silberg, supra*, 50 Cal.3d at pp. 213-214.)

### A.    FIRST STEP

The initial burden is on the defendants to show their conduct is protected under section 425.16, subdivision (b)(1), here, the litigation privilege.  Evidence submitted by Clayton and Taylor shows:  (1) six former coworkers who worked with plaintiff came to their law office seeking advice; (2) they discussed plaintiff's alleged misconduct similar to those allegations made by an existing client (Cortez); and (3) Clayton contacted Spitz to determine whether plaintiff was interested in settlement discussions for the six former coworkers before filing suit.  For the reasons discussed below, we conclude defendants met their burden of showing Clayton's various communications with Spitz were protected by the litigation privilege.

#### 1.    *Time-Barred Defendants and Attorneys:  No Good Faith*

Plaintiff contends the time-barred defendants (Ochoa, Vera and Velasco) and the attorney defendants (Clayton, Taylor, and the firm, Taylor & Ring, LLP) did not make their demands in good faith contemplation of filing suit.  According to the plaintiff, this is so because "[t]hree of the ex-employees' claims were indisputably time-barred:  Domingo Ochoa was terminated from Univision in 2007; Sergio Vera was terminated in 2008; and Bertha Velasco was terminated in 2010."  Citing *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1256, he argues, "[w]hile good-faith settlement demands fall within the ambit of protected 'petitioning activity,' the anti-SLAPP statute does *not* protect purported settlement communications where there is *no* good-faith contemplation of litigation."

Plaintiff relies on *Bailey v. Brewer* (2011) 197 Cal.App.4th 781 (*Bailey*) in support of his position.  *Bailey* concerned the doctrine of res judicata.  There, a plaintiff filed suit

for intentional interference with contractual relationship, among other claims, based on a cease-and-desist letter sent by a defendant to a third party. Defendant filed an anti-SLAPP motion claiming his conduct was covered by the litigation privilege. The trial court denied the motion. *Bailey* affirmed the trial court's finding. In reaching this result, *Bailey* relied on the following: "the question whether [defendant is] barred from filing the proposed lawsuit against respondent under the doctrine of res judicata is a preliminary decision based upon undisputed evidence in the record," and "[a] small claims plaintiff is collaterally estopped from relitigating the same issue in superior court where the record is sufficiently clear to determine that the issue was litigated and decided against plaintiff in the small claims action." (*Id.* at pp. 790-791.) *Bailey* reviewed the evidence and concluded the defendant's dispute was previously litigated and resolved against him through a small claims decision. As such, *Bailey* held the defendant's statements of intent to litigate were not contemplated in good faith. (*Id.* at p. 793.) In analyzing the public policy behind the litigation privilege, *Bailey* reasoned, "[t]he right to petition, . . . is not implicated where a party already has exercised that right, has lost on the merits, and is seeking to relitigate the same action. [Citation.]" (*Ibid.*)

*Bailey* is distinguishable for several reasons. First, the doctrine of res judicata and the statute of limitations serve different policy goals. Statutes of limitations "promote[s] justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." (*Cutujian v. Benedict Hills Estates Assn.* (1996) 41 Cal.App.4th 1379, 1387, citing *Telegraphers v. R.Y. Express Agency* (1944) 321 U.S. 342, 348-349; accord, *Wood v. Elling Corp.* (1977) 20 Cal.3d 353, 362.) It "also serve[s] many other salutary purposes . . . including protecting settled expectations; giving stability to transactions; promoting the value of diligence; encouraging the prompt enforcement of substantive law; avoiding the retrospective application of contemporary standards; and reducing the volume of litigation. [Citations.]" (*Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 872.) Contrarily, the policy underlying res judicata " 'is based upon the sound public policy of limiting litigation by preventing a party who has had one

fair trial on an issue from again drawing it into controversy.' [Citation.]" (*Hollywood Circle, Inc. v. Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 731-732.) In the case of res judicata, as *Bailey* aptly reasoned, the policy of promoting freedom of access to the courts, an important policy behind the litigation privilege, is not served by one who has already exercised that very access. On the other hand, no policy considerations behind the statute of limitations directly contradicts any of the policy reasons that support the litigation privilege.

Ultimately of course, the critical question is whether or not the individuals who claim the litigation privilege, both attorney and nonattorney, contemplated litigation in good faith. On this, the two doctrines present a starkly different picture. For those in the res judicata category, both an attorney as well as a nonattorney with knowledge their case has already run its course through the judicial process knows finality shuts their door to further access. For those in the statute of limitation category, on the other hand, a nonattorney individual may be completely unaware of how the statute of limitations operates. To conclude as a matter of law such an individual lacks good faith is contrary to common sense. Here, there is no evidence that Ochoa, Vera, or Velasco knew their claims were barred by the statute of limitations and, as such, had no good faith in pursuing their claims.

We view attorneys differently. They are, or should be, aware of the statute of limitations. We can envision attorneys engaging in prelitigation conduct on a time-barred case without good faith. Here, however, given the set of unique facts presented, ours is not that case. Evidence submitted by Clayton and Taylor shows they spoke with six of plaintiff's former coworkers about his alleged misconduct, claims similar to ones made by Cortez that they were already pursuing with Univision Radio. While Clayton believed further investigation was needed before an actual suit was filed, he contacted Spitz to determine whether plaintiff was interested in a settlement before a suit was filed. To be sure, this is not a case where Clayton was attempting to settle a claim of a single client whose case he knew was stale under the statute of limitations. Clayton was representing the interests of multiple clients simultaneously, some whose claims might have been

10

statutorily barred whereas others were not.  As such, even if the statute of limitations ultimately proved to be a bar for Ochoa, Vera and Velasco as plaintiff claims, it is far from undisputed Clayton did not entertain good faith contemplation of filing suit. Clayton indicated he was conducting further investigations into his respective clients' claims.  It is possible, at the conclusion of the investigation, Clayton might have determined the statute of limitations was indeed a bar for some of the clients.  However, such a potential does not negate good faith as a matter of law.

### 2. *Extortion as a Matter of Law*

Plaintiff contends the defendants' actions constituted extortion as a matter of law. Plaintiff cites *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*), a California Supreme Court decision which held the litigation privilege does not apply to petitioning activity that is illegal as a matter of law.  In *Flatley*, the high court determined the lawyer's conduct was extortion as a matter of law and not protected by California's anti-SLAPP statute.  Since *Flatley*'s publication, appellate courts citing *Flatley* have been careful to observe that the exception is narrow and applies only in undisputed cases of illegality. (*Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 210.)

In *Malin v. Singer* (2013) 217 Cal.App.4th 1283, the Court of Appeal explained, "[t]he crime of extortion is defined as ' "the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear . . . ." (Pen. Code, § 518.)  Fear, for purposes of extortion "may be induced by a threat, either:  [¶] . . . [¶] . . . To accuse the individual threatened . . . of any crime; or, . . . To expose, or impute to him . . .any deformity, disgrace or crime[.]" (Pen. Code, § 519.)  "Every person who, with intent to extort any money or other property from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat." (Pen. Code, § 523.)' [Citations.]" (*Id.* at p. 1294.)

Plaintiff contends "[t]he present case falls under the *Flatley* exception:  [t]he threat to file time-barred complaints unless Mr. Sotelo paid $4.9 million constitutes extortion as

a matter of law." But this is not the ground on which *Flatley* found the attorney's conduct illegal as a matter of law. In *Flatley,* the court noted, "[a]t the core of [the attorney's] letter are threats to publicly accuse Flatley of rape *and to report and publicly accuse* him of other unspecified violations of various laws unless he 'settled' by paying a sum of money . . . ." (*Flatley*, *supra*, 39 Cal.4th at p. 329, italics added.) It is the accusation of criminal conduct to governmental authorities unless payment was made that the court found illegal as a matter of law. *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799 (*Mendoza*) is in accord. *Mendoza* noted, "[t]he threat to report a crime may constitute extortion even if the victim did in fact commit a crime. The threat to report a crime may in and of itself be legal. But when the threat to report a crime is coupled with a demand for money, the threat becomes illegal, regardless of whether the victim in fact owed the money demanded. [Citation.] ' "The law does not contemplate the use of criminal process as a means of collecting a debt." [Citations.]' (*Ibid.*) 'Attorneys are not exempt from these principles in their professional conduct. Indeed, the Rules of Professional Conduct specifically prohibit attorneys from "threaten[ing] to present criminal, administration, or disciplinary charges to obtain an advantage in a civil dispute." (Rules of Prof. Conduct, rule 5-100(A).)' [Citation.]" (*Mendoza*, at p. 805.) In *Mendoza*, the defendant threatened to report plaintiff to the California Attorney General, the Los Angeles County District Attorney, and the Internal Revenue Service unless the plaintiff paid what defendant claimed was owed. (*Mendoza*, at p. 802.)

Nothing close to *Flatley* or *Mendoza* occurred here. Indeed, the plaintiff does not argue Clayton threatened to report him to any governmental authorities for criminal conduct unless he paid what was claimed. Instead, he argues Clayton lacked good faith when making the demand for a settlement. As noted in part II(A)(1) of this opinion, lack of good faith was not indisputably shown. Further, here, there is not the indisputable evidence of illegal extortion evident in *Flatley* and *Mendoza* to find the litigation privilege does not apply. The evidence submitted to the trial court which we now review shows that on August 16, 2013, Clayton sent a letter to Spitz to determine whether plaintiff was interested in settlement discussions. The letter is unexceptional. It makes

12

no threats, either express or implied, to report criminal conduct to any governmental authority. The subsequent demand letter was made at the request of the plaintiff but again contains no threat to report criminal conduct unless payment is made. The phone conversations and e-mails likewise do not contain the requisite threat to report a crime unless payment is made. This was a standard inquiry any lawyer would make before filing suit. What makes this case different is plaintiff's celebrity status and the damage these allegations might do to that status. Certainly, there was leverage. However, that leverage did not render Clayton's conduct illegal as a matter of law. We conclude the defendants met their burden of showing the litigation privilege applied.

### B.    SECOND STEP

Under the second step of the section 425.16 analysis, plaintiff must demonstrate a probability of prevailing on his claims of extortion and intentional infliction of emotional distress. In order to meet this burden, plaintiff is required to both plead claims that are legally sufficient, and to make a prima facie showing, by admissible evidence, of facts that would merit a favorable judgment on those claims. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 (*Wilson*); *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823-824, 830; *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497-1498, [disapproving consideration of statements made on information and belief].) Although the burden is on the plaintiff, the court must also consider evidence that the defendant presents. (§ 425.16, subd. (b)(2).) However, this is not a weighing process in terms of either credibility or persuasiveness. Rather, the defendant's evidence is considered to assess whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element. (*Wilson, supra*, at p. 821; *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906).

### 1.    *Affirmative Defense:  Litigation Privilege*

The litigation privilege applies to all torts except malicious prosecution. (*Silberg, supra*, 50 Cal.3d at pp. 211-212.) Here, the litigation privilege applies as an affirmative defense to plaintiff's claims of civil extortion and intentional infliction of emotional distress. Plaintiff contends he presented evidence negating the application of the

13

litigation privilege, or at least raising factual questions regarding its applicability.  Citing *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 35, footnote 10, he claims the question whether a communication relates to a party's good faith intention to file a lawsuit is a question of fact that cannot be resolved as a matter of law in an anti-SLAPP motion unless the evidence is undisputed.

This is not quite true.  *Blanchard, supra,* 123 Cal.App.4th 903, is instructive.  The question is not whether there is a perceived dispute of facts.  Instead, the question is whether the defendant's evidence defeats, as a matter of law, the plaintiff's contested facts.

In *Blanchard*, DIRECTV sent demand letters to the plaintiffs requesting that they stop using devices to pirate DIRECTV's signals.  The letter indicated pirating signals was theft and a violation of federal law.  The letter provided the recipient with an opportunity to resolve the issue by settlement before a suit was filed.  (*Blanchard, supra*, 123 Cal.App.4th at pp. 909-910.)  Plaintiffs filed a suit for civil extortion.  DIRECTV filed a special motion to strike the complaint under section 425.16 and asserted the litigation privilege.  (*Id.* at p. 911.)  Plaintiffs opposed the motion and contended the litigation privilege did not apply because:  "(1) not all of the devices are used for illegal purposes; (2) the records that DIRECTV seized did not indicate how the devices would be used; (3) *many demand letters were sent after the statute of limitations had run*; and (4) the only judgments DIRECTV had obtained so far in their federal litigation on the demand letters across the United States were default judgments.  (Italics added.)"  (*Ibid.*)  Plaintiffs argued they had presented sufficient evidence for a trier of fact to determine whether the litigation privilege applied to the case.  (*Id.* at p. 919.)

In sharp focus, Blanchard noted, "the trial court *must consider facts so as to make a determination whether plaintiffs can establish a prima facie probability of prevailing on their claims.*  [Citations.]  Thus, while the court does not weigh evidence, it must determine whether plaintiffs have demonstrated evidence which, *if credited*, would justify their prevailing at trial.  The court also considers DIRECTV's evidence to determine if it has defeated that submitted by plaintiff as a matter of law.  [Citation.]  Here, defendant

14

has demonstrated that it sent the demand letters, citing statutory authority [citations]; and it has filed lawsuits against thousands of defendants so far. Thus, DIRECTV demonstrated a logical relationship between its demand letters and the lawsuits. At best plaintiffs have demonstrated a dispute about the applicability of the privilege, whereas DIRECTV has defeated plaintiffs' evidence. Because plaintiffs cannot show prima facie their probability of prevailing on the merits, as a matter of law, the trial court properly concluded that the litigation privilege applied. [Citation.]" (*Blanchard, supra*, 123 Cal.App.4th at p. 921, original italics.)

In the instant case, the trial court cited *Blanchard* and conducted the same analysis. In so doing, the trial court concluded the defendants' evidence defeated that of the plaintiff as a matter of law. The trial court noted, "At best, Plaintiff has adduced evidence that Clayton believed that the claims of three of the seven Staffer Defendants (Ochao, Vera, and Velasco) were time-barred. . . . However, considering the nature of the claims of the remaining four Staffer Defendants, the fact that two of the Staffer Defendants whose claims were purportedly time-barred (Vera and Velasco) had gone public with their claims before the communications by Clayton which are at issue took place . . . , and the interrelated nature of all seven potential plaintiffs' claims, the Court concludes that even if Clayton believed that the claims of Ochoa, Vera, and Velasco were time-barred, that did not nullify the application of the litigation privilege with respect to the communications at issue." The trial court did not err.

Plaintiff would have us parse between what he calls time-barred and release-barred defendants when looking at this question. This is a stilted view of what actually occurred and does not take into account the plain and obvious reason Clayton contacted Spitz with urgency—the need to file a lawsuit before the statute of limitations expired on some of the claims. The Los Angeles Times article ran on July 23, 2013. This triggered the six former employees to seek out Clayton in early August 2013. After assessing their claims, Clayton moved expeditiously with the filing of a complaint in mind. Additional investigations were ongoing on the actual suit to be filed. The deadline was real. All of this clearly shows the communication that took place between Clayton and Spitz was

logically related to litigation—the need to file a complaint by August 30, 2013. This glaring fact defeats plaintiff's evidence.

Plaintiff's evidence has failed to demonstrate prima facie that he could overcome the litigation privilege. Just as *Blanchard* noted, at best, plaintiff has demonstrated a dispute about the applicability of the privilege, but defendants have defeated the plaintiff's evidence. Our research has not disclosed any case which equates good faith with likelihood of winning the case. The mere fact that a case may be defeated by a statutory bar, or by evidence that the person sued is immune from suit by a validly executed release, does not mean no good faith existed at the time suit was contemplated. The trial court was correct to grant the motion.

### 2. *Denial of Motion for Discovery*

Plaintiff contends the trial court erred by denying his motion for discovery because the release agreement, if it existed, went to the heart of his ability to prove a prima facie case.

When a special motion to strike is filed under section 425.16, discovery is stayed in order to minimize the hassle and the costs inherent in complying with discovery requests until the motion is decided. Section 425.16, subdivision (g) states, "All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. . . . The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision." "We review for abuse of discretion the trial court's decision as to whether a plaintiff has complied with the requirements of section 425.16, subdivision (g) to merit discovery prior to a hearing on the motion to strike. [Citations.]" (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1247.) The trial judge's application of discretion in discovery matters is presumed correct, and the complaining party must show how and why the court's action constitutes an abuse of discretion in light of the particular circumstances involved. (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 434.)

16

In ruling on this request, the trial court stated, " '[d]iscovery may not be obtained merely to "test" the opponent's declarations.' [¶] . . . [¶] . . . the Court concludes that, although Plaintiff's request for discovery is understandable, under the circumstances Plaintiff has not shown the good cause required by CCP 425.16(g)." As we previously discussed, in this particular case, the existence of the signed releases would not have negated good faith to pursue litigation. For this reason, we conclude the trial court did not abuse its discretion in denying this request.

## DISPOSITION

The trial court's order granting the special motion to strike pursuant to section 425.16 is affirmed. Defendants to recover their costs on appeal.

OHTA, J.[*]

WE CONCUR:

FLIER, Acting P. J.

GRIMES, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17